UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
MARK RUBENSTEIN,

        Plaintiff,

     - against –

URBAN ONE, INC. and ALFRED C.
LIGGINS III,

        Defendants.

------------------------------X

**MEMORANDUM AND ORDER**
20 Civ. 11128 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    This is an action brought by plaintiff Mark Rubenstein ("Rubenstein") based on allegations that Alfred C. Liggins III ("Liggins") violated Section 16(b) of the Securities Exchange Act of 1934 through a series of transactions in the stock of Urban One, Inc. ("Urban One") during the Spring and Fall of 2020. After Urban One declined to pursue these claims, Rubenstein sued Liggins, including Urban One as a nominal defendant. Liggins now moves to dismiss the complaint in its entirety, arguing that Section 16(b) does not cover the transactions at issue. For the reasons discussed below, we grant Liggins's motion.

### BACKGROUND[1]

---

[1] The following facts, which are drawn from the Amended Complaint and the parties' briefing papers and exhibits, are accepted as true for purposes of the Court's ruling on Liggins's motion to dismiss. The Court draws all reasonable inferences in Rubenstein's favor. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

I.    **Factual Background**

Rubenstein is a shareholder in Urban One, "the largest African-American owned television network and distributor of digital urban content in the United States." Defendants' Motion to Dismiss the Amended Complaint ("MTD") at 2; Amended Complaint ("Amend. Compl.") ¶ 2. Liggins is its CEO. Id.; Amend. Compl. ¶ 5. Urban One is a public company, which has issued four classes of equity securities. See Plaintiff's Opposition to Defendant's Motion to Dismiss the Amended Complaint ("Pl. Opp'n") at 2. The two classes of equity securities at issue in this case, Classes A and D, trade publicly on the Nasdaq exchange. Amend. Compl. ¶ 3. Class A shares confer voting rights of one vote per share and are convertible into Class D shares on a one-to-one basis. See Pl. Opp'n at 2; MTD Ex. C. Class D shares are non-convertible and do not confer any voting rights. Id. The two classes have historically traded at different, albeit similar, prices. See MTD Ex. A; Pl. Opp'n App'x.

On May 14, 2020, Urban One filed an 8-K announcing that it had received notice from Nasdaq stating that Urban One's Class D shares were not in compliance with Nasdaq rules, having fallen below $1.00 per share, and were at risk of being delisted. See MTD Ex. D. Urban One's Class A shares "[were] not impacted by the Notice and remain[ed] in compliance with all listing

-2-

requirements." Id. Nasdaq granted Urban One until December 28, 2020 to become compliant. Id. Urban One informed investors that it intended to both "monitor its closing bid," as well as "consider available options to resolve the Company's noncompliance with the minimum bid price requirement." Id.

On June 17, 2020, Urban One filed an 8-K announcing that it had entered into a private transaction with Brigade Capital Management, LP ("Brigade") on June 11, 2020 to acquire 3,208,288 shares of Class D stock, with the intent of retiring the shares upon settlement of the transaction. See MTD Ex. B. In the same 8-K, Urban One also announced that Liggins had purchased 729,873 shares of Class D stock from Brigade in a private transaction. Id.

During this same time period in June 2020, Urban One's stock price experienced large growth following an increase in trading volume. See MTD at 7; Pl. Opp'n at 4. In particular, the Class A share price reached a high of $36.30. See MTD Ex. A; Pl. Opp'n App'x. Class D shares also increased in price, although this increase was minimal compared to the increase in Class A price. Id. Defendants have noted that the stock price increase corresponded with a public movement encouraging investment into African-American owned businesses. See MTD at 7-8; MTD Ex. E. On June 22, 2020, Liggins sold 574,909 Class A shares into the public

market.   Amend. Compl. ¶ 14.   By Fall 2020, both share classes
were trading close to their pre-June 2020 prices.   See MTD Ex. A;
Pl. Opp'n App'x.   In November 2020, Liggins purchased additional
shares of Class D stock on the public market.   Specifically, he
purchased 274,457 shares on November 13, 2020, 249,541 shares on
November 23, 2020, 287,231 shares on November 24, 2020, and 182,371
shares on November 25, 2020.   Amend. Compl. ¶ 10.

## II.  Procedural History

On November 17, 2020, Rubenstein sent a demand for prosecution
to Urban One based on Liggins's transactions.   Amend. Compl. ¶ 8.
On December 21 and 23, 2020, counsel for Urban One informed
Rubenstein via email that the company did not believe that any
liability existed and would not seek to recover any profits.   Id.
Thereafter, on January 1, 2021, Rubenstein filed this complaint.
See Amend. Compl.   On May 10, 2021, Liggins moved to dismiss the
complaint, and on May 12, 2021 Urban One joined Liggins's motion.
See ECF Nos. 23, 26.

## STANDARD OF REVIEW

In order to survive a motion to dismiss under Rule 12(b)(6),
"a complaint must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its face."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation
marks and citation omitted).   A claim is considered plausible "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," and it must "draw all reasonable inferences in favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

In ruling on a Rule 12(b)(6) motion to dismiss, in addition to the allegations in the complaint, the court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiff['s] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). Courts may take judicial notice of "the contents of relevant public disclosure documents required to be filed with the SEC as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

**DISCUSSION**

**I.   Section 16(b) Framework**

Section 16(b) of the Exchange Act states in relevant part:

> [f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, . . . of any equity security of such issuer . . . within any period of less than six months . . . shall inure to . . . the issuer.

15 U.S.C. § 78(p)(b).

"The purpose of Section 16(b) is to deter 'insiders,' who are presumed to possess material non-public information about the issuer, from using such information to purchase or sell the issuer's equity securities at an advantage over persons with whom they trade." Steel Partners II, L.P. v. Bell Indus., Inc., 315 F.3d 120, 123 (2d Cir. 2002).  Further, Section 16(b) functions based on strict liability, "operat[ing] mechanically, with no required showing of intent to profit from the use of inside information." Gibbons v. Malone, 703 F.3d 595, 599 (2d Cir. 2013) (internal quotation marks and citation omitted).  Given the aim "to deter insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock," Morales v. Quintel Entm't, Inc., 249 F.3d 115, 122 (2d Cir. 2001), plaintiffs need only show "that there was (1) a purchase and (2) a sale of securities (3) by an insider (4)

-6-

within a six-month period." <u>Chechele v. Sperling</u>, 758 F.3d 463, 467 (2d Cir. 2014) (internal quotation marks and citation omitted). Where a defendant is found to have violated Section 16(b), the remedy is "disgorgement to the company of any profit derived from the matching purchase and any sale of an 'equity security' (other than an exempted security) within a six-month period by a statutory insider." <u>Gwozdzinsky v. Zell/Chilmark Fund, L.P.</u>, 156 F.3d 305, 308 (2d Cir. 1998) (quoting 15 U.S.C. § 78(p)).

Courts therefore apply a "mechanical" approach to Section 16(b), finding no liability for "corrupt insiders who skirt the letter of the prohibition." <u>Magma Power Co. v. Dow Chem. Co.</u>, 136 F.3d 316, 320-21 (2d Cir. 1998). Additionally, the Supreme Court, "recognizing the overbreadth of Section 16(b), [has] held that under the strict terms of Section 16(b), the prevailing view is to apply the statute only when its application would serve its goals." <u>Gwozdzinsky</u>, 156 F.3d at 310 (internal quotation marks and citation omitted). As a result, "the Supreme Court has permitted a departure from flat rules in a very limited number of situations" in which courts will review "whether [a] particular type of transaction involved is one that gives rise to speculative abuse where the instrument or transaction is unorthodox or borderline." <u>Roth v. Goldman Sachs Grp., Inc.</u>, 740 F.3d 865, 869 (2d Cir. 2014) (internal quotation marks and citation omitted). These

-7-

"unorthodox" transactions are those that include "stock conversions . . . and dealings in options, rights, and warrants." Portnoy v. Seligman & Latz, Inc., 516 F. Supp. 1188, 1195 (S.D.N.Y. 1981). Although "deciding whether a transaction is 'unorthodox' often simply begs the question of whether section 16(b) applies[,] . . . . courts frequently apply . . . objective and pragmatic approaches in cases under this provision." Id. Where there is no possibility of speculative abuse, courts will "refuse to impose liability even though there was arguably a matching purchase and sale by an insider within six months." Gwozdzinsky, 156 F.3d at 310. "[C]ourts have [also] cautioned that financial instruments that do not fall squarely into [Section 16(b)'s] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)." Rubenstein v. Knight-Swift Transportation Holdings Inc., 492 F. Supp. 3d 206, 216 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). Due to the strict liability nature of Section 16(b), courts narrowly interpret the definition of "sale and purchase" of an "equity security" as only applying to the same class of security. See Gibbons, 703 F.3d at 600.

### A. Derivative Securities

The SEC has further expanded Section 16(b) to include transactions involving derivative securities, "including options,

warrants, convertible securities, stock appreciation rights, and similar securities with a value derived from the value of an equity security." Gwozdzinsky, 156 F.3d at 308.  In 1991, the SEC amended its rules to clarify the application to derivative securities. See generally, Ownership Reports and Trading by Officers, Directors, and Principal Security Holders, Exchange Act Release No. 28,869, 1991 WL 292000 (Feb. 8, 1991) ("1991 Release").  Under the SEC rules, "[f]or purposes of Section 16 of the Act, both derivative securities and the underlying securities to which they relate shall be deemed to be the same class of equity securities." Rule 16a-4(a), 17 C.F.R. § 240.16a-4.  Under Section 16(b), derivative securities "derive their value . . . from an underlying security." Analytical Survs., Inc. v. Tonga Partners, L.P., 684 F.3d 36, 48 (2d Cir. 2012).  Thus, the motivating concern was that "unless this functional equivalence were recognized and accounted for, insiders could evade disgorgement of short-swing profits simply by buying call options and selling the underlying stock, or buying underlying stock and buying put options." Magma Power Co., 136 F.3d at 321 (internal quotation marks and citation omitted).

>        *i. Fixed Price and Floating Price Derivatives*

However, Section 16(b) is not all encompassing with regards to different types of derivative securities.  While securities with a fixed price conversion are considered derivative securities

for the purposes of Section 16(b), the SEC excludes those convertible securities that convert at a floating price. See 17 C.F.R. § 240.16a-1(c)(6). As explained by the SEC, "[r]ights without a fixed exercise price do not provide an insider the same kind of opportunity for short-swing profit since the purchase price is not known in advance. The opportunity to lock in a profit begins when the exercise price is fixed; at that time, the right becomes a derivative security subject to Section 16." 1991 Release at *17. Thus, the purchase of a derivative security with a fixed exercise price would be considered a "purchase" for Section 16(b) purposes. In contrast, only the exercise of a derivative security with a floating price conversion would be considered a "purchase," as that is the point in time in which the price becomes "fixed." See Analytical Survs., Inc., 684 F.3d at 49 (quoting 1991 Release).

### ii. Fixed Ratio Conversion

Despite the SEC's exclusion of convertible financial instruments with a floating exercise price, the SEC has also held that certain convertible instruments with a "fixed conversion privilege [are] deemed to have a fixed exercise price." 1991 Release at *59 n. 134. Therefore, the Second Circuit has held that "obtaining certain financial instruments with a fixed-ratio conversion feature thus also qualifies as a 'purchase' of the security within the meaning of § 16(b)." Gibbons, 703 F.3d at

602.   The Court of Appeals in <u>Gibbons</u> further clarified that fixed-ratio conversion is tied to the "economic equivalence principle."   <u>Id.</u>   Economically equivalent securities are "not meaningfully different," and therefore any conversion of the security occurs in practice at a fixed price of $0.   Such securities are thus treated as fixed price instruments for the purposes of Section 16(b).   However, "where [a] convertible security d[oes] not trade at a price at least equivalent to the aggregate price of the securities into which it [is] convertible," the "economic equivalence [principle] has no relevance."   <u>Blau v. Lamb</u>, 363 F.2d 507, 524-25 (2d Cir. 1966); see <u>Gibbons</u>, 703 F.3d at 602 (stating that where prices between securities "fluctuate relative to one another [they] do not qualify as economically equivalent.").   These instruments will not be treated as fixed price derivatives for the purposes of Section 16(b), even if the conversion price involves a fixed ratio.

## II.  Analysis

### A. <u>The Statutory Purpose of Section 16(b) is Not Implicated</u>

We begin our analysis by examining whether Liggins's trades implicated the statutory purpose of Section 16(b).   It is clear that they do not.   Plaintiffs have not identified any short-swing transactions within the same class of stock, but instead appear to have searched for any transactions that occurred within a six-

month window, despite a lack of connection between the trades and differences in the classes of the shares in question.  Of the transactions identified by Rubenstein, only Liggins's purchase of 729,873 Class D shares from Brigade was related to non-public information, since Liggins was aware of Urban One's decision to purchase and retire additional shares of Class D stock from Brigade in an effort to raise the price of Class D shares above $1.  All of this information was disclosed to the market six days following the transaction.  See MTD Ex. B.  While the Court recognizes that Section 16(b) does not require a showing of misuse of inside information, we also recognize that the purpose of the statute is to "deter 'insiders' . . . from using [inside] information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade." Gwozdzinsky, 156 F.3d at 308; Donoghue v. Murdock, No. 13 Civ. 1224, 2013 WL 4007565, at *10 (S.D.N.Y. Aug. 6, 2013) ("[T]he purpose of § 16(b) . . . is to prevent the speculative abuse of inside information.") (emphasis omitted).[2]  As a result, we "apply the statute only when its application would serve its goals." Kern Cnty. Land Co. v.

---

[2] Rubenstein puts forth a number of arguments regarding the transactions that are irrelevant under a strict liability analysis.  For example, Rubenstein focuses on Liggins's control over the majority of "super-charged Class B shares," which Rubenstein argues protected Liggins from relinquishing control over voting rights.  See Pl. Opp'n at 11.  This is superfluous.  Examination of potential motive is immaterial in the context of strict liability.  See Lewis v. Varnes, 505 F.2d 785, 787 (2d Cir. 1974) ("[Section 16(b)] imposes liability . . . regardless of motive or intent").

<u>Occidental Petroleum Corp.</u>, 411 U.S. 582, 595 (1973).

A review of the identified transactions shows that they did not present an opportunity for speculative abuse and "short-swing" profits based on misuse of inside information.  By the time that Liggins sold his Class A shares, the market had access to the same information that Liggins had with regard to the prior purchases of Class D shares.  <u>See</u> MTD Ex. B.  Rubenstein has not alleged that Urban One's stock price increase was the result of any inside information to which Liggins was privy.  Nor does Rubenstein allege that the Class A shares were purchased within the six-month window, and Liggins confirms that they were "long-held".  <u>See</u> MTD at 8.  Thus, the sale of Class A shares following the unexpected sharp stock price increase was not based on any short-term speculation in Class A shares, nor any changes in the share price for Class D shares.  Instead, the only reasonable conclusion is that Liggins capitalized on an unexpected beneficial upturn in company stock to realize long-term profits.  <u>See</u> <u>Rosen v. Drisler</u>, 421 F. Supp. 1282, 1287-88 (S.D.N.Y. 1976) (finding no Section 16(b) liability where defendants realized long-term profits rather than profiting "as insiders taking a short-term speculative position").

Further, Rubenstein fails to connect the November 2020 Class D purchases to the June 2020 Class A sale.  These purchases were made in a different share class and were the result of acquisitions

on the open market, and there is no linkage in the trades in the two classes of stock.   At no point did Liggins exercise his conversion option on his Class A shares, which would have at least provided some link between the two classes.   Moreover, at no point in the six-month window, or at any point in Urban One's history, would it have made economic sense to exercise the conversion privilege given the price disparity between the two classes.   As such, there is no logical argument that explains how an investor would be able to speculate in the Class A shares in order to make a profit from the conversion privilege.   Class A shares have historically consistently traded at a higher price point than Class D shares, as is to be expected based on the additional voting rights conferred.   <u>See</u> MTD Ex. A; Pl. Opp'n App'x.   Thus, the November 2020 purchases also do not appear to present an opportunity for speculative abuse and thus do not fall under the provisions of Section 16(b).

B. <u>Class A Shares Are Not Derivative Securities for Purposes of Section 16(b)</u>

Even assuming *arguendo* that the purpose of Section 16(b) is served here, an examination of the shares at issue further demonstrates that Section 16(b) does not apply.   As stated above, any convertible security that has a floating price for conversion is excluded from the SEC's definition of derivative security for purposes of 16(b).   <u>See</u> 17 C.F.R. 240.16a-1(c)(6).   It is also

undisputed that Urban One's Class A shares do not convert at a fixed price, but rather convert at a floating price.  Urban One's Certificate of Amendment sets out the conversion rights of Class A shares, which can be converted "at any time," following "written notice to the Corporation [of] at least ten (10) days prior to the Conversion date."  See MTD Ex. C.  The "conversion shall be deemed to have been effected as of the close of business on the later of the Conversion Date or the date upon which the Corporation shall have received the certificate or certificates representing the shares to be converted."  Id.  With no fixed conversion price or fixed conversion formula to determine an exercise price, the conversion price for Class A shares is instead determined at the time that shares are exchanged.[3]  As a result, during the course of the six-month window in which the transactions at issue occurred, the difference in closing price between the two classes drastically varied, fluctuating from a difference of $0.61 on June 11, 2020, $32.15 on June 19, 2020, and $4.07 on November 25, 2020. See MTD Ex. A; Pl. Opp'n App'x.

   C. Class A Shares Are Not Economically Equivalent to Class D Shares

---

[3] Rubenstein cites Gund v. First Fla. Banks, Inc., 726 F.2d 682 (11th Cir. 1984) as an analogous case because it "involves transactions in convertible and underlying securities." Pl. Opp'n at 15.  However, unlike here, the convertible securities in Gund were "freely convertible into shares of . . . common stock at a conversion price of $12 1/8 per share," with "each $1,000 debenture [convertible] into 82.47 shares of . . . common stock." Gund, 726 F.2d at 684. There is no analogous conversion formula here.

Rubenstein, however, argues that the appropriate analysis of the Class A shares is based on the fixed ratio conversion privilege, which he alleges results in a fixed price. Therefore, we next examine whether the Class A and Class D shares are "economically equivalent," and thus "deemed to have a fixed exercise price" based on their 1:1 fixed conversion ratio. See 1991 Release at *59 n. 134; pp. 10-11 supra. At the outset, a simple review of the trading prices of the two classes, as well as the trading graphs presented by plaintiff and defendants, see MTD at 4; Pl. Opp'n p. 8, establishes that the two classes are not "economically equivalent." While the two classes may have traded at generally similar price points over the course of the past 18 years, they do not trade at the same price. It is clear that the two classes trade independently. Class A shares have deviated from the Class D shares on a number of occasions, including in 2008, 2018, and most notably in Spring 2020, which is the focus of this lawsuit. See Pl. Opp'n at 8. Rubenstein fails to provide any evidence that Class A shares in any way derive value from the Class D shares, or that changes in Class D prices drive the value of Class A shares. While the two classes may have moved similarly in the market, any noticeable similarity in trading trends between the two classes is logical, given that market news would tend to shift all classes of Urban One stock in the same direction. Given

this "fluctua[tion] relative to one another," the two shares "do not qualify as economically equivalent." Gibbons, 703 F.3d at 602. Further, as noted in Gibbons, the voting rights conferred by Class A shares "readily distinguish[es]" them from the non-voting Class D shares. Id. Therefore, we find the two classes to be economically distinct, and thus the fixed conversion privilege does not render a fixed price to the Class A shares. See Lamb, 363 F.2d at 522 ("[E]conomic equivalence has no relevance in a situation where the convertible security did not trade at a price at least equivalent to the aggregate price of the securities into which it was convertible."). Under SEC rules, the Urban One Class A shares are thus not considered a matchable derivative under Section 16(b). Liggins effectively traded in two separate classes of stock, with the conversion privilege ultimately irrelevant to any determination of Section 16(b) liability.

## CONCLUSION

Accordingly, for the reasons stated above, we grant Liggins's motion in its entirety and the Amended Complaint is dismissed with prejudice. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 23 and to close the case.[4]

**SO ORDERED.**

---

[4] The Court acknowledges that Liggins requested oral argument. However, given our holding and the purely legal nature of the argument, the Court determined that oral argument was not necessary in the circumstances.

Dated:     New York, New York
           January 13, 2022

                                        _____
                                          NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE